## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIN YATES, individually and on behalf of all others similarly situated,<br><br>                                   Plaintiff,<br><br>v.<br><br>EVERNORTH HEALTH, INC. and MDLIVE, INC.,<br><br>                                   Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Erin Yates ("Plaintiff") brings this action on behalf of herself, and all others similarly situated against Defendants Evernorth Health, Inc. ("Evernorth") and MDLive, Inc. ("MD Live") (collectively, "Defendants"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. Plaintiff brings this suit on behalf of all persons who accessed their private patient portal, either directly through the website www.mdlive.com (the "Website"), or through their online healthcare account with Cigna Healthcare ("Cigna"). Cigna partners with Defendants for the provision of telehealth services for all Cigna policy holders. Once logged into their Cigna account, consumers can click a link for telehealth services, which will redirect them to the MD Live Website, where they can search for and schedule medical appointments.

2. MD Live is a telehealth provider that offers virtual medical treatment and services to patients across the country. MD Live was acquired by Evernorth in 2021.[1]

---

[1] https://www.evernorth.com/articles/evernorth-announces-acquisition-of-mdlive.

3.      Evernorth is a subsidiary of Cigna, and is responsible for Cigna's health services business.[2]  After acquiring MD Live, Evernorth has taken an active role in developing and growing the MD Live platform, including its telehealth services and marketing strategies.

4.      Patients trust healthcare providers, like Defendants, to safeguard their information. When searching for and scheduling medical appointments online, patients reasonably expect the sensitive and legally protected information related to their medical appointment will remain confidential and protected from unknown third parties.  Such an expectations are based, in part, on legal protections afforded to such information.  Being able to trust that their health information is secure is essential to upholding patient rights and the integrity of our healthcare system.

5.      Information related to medical appointments is protected by state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA") and 31 Pa. Code § 146b.  Medical providers are legally required to safeguard patients' health information.  This means that any data related to a patient's health and treatment history, including patient status, must be kept confidential and secure.  Given these protections, patients reasonably expect that such information will not be disclosed to unknown third parties.

6.      Despite these protections, and unbeknownst to Plaintiff and members of the putative classes, Defendants disclosed the confidential and protected health information of their patients to Google LLC ("Google") and Meta Platforms, Inc. ("Meta")[3] (collectively, the "Third Parties") without their knowledge or consent.  Such disclosures were made due to the value such

---

[2] https://www.evernorth.com/cigna-medical-group-to-expand-and-changes-name-to-evernorth-care-group.

[3] In October 2021, Facebook, Inc. change its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Facebook."

information maintains for advertising purposes.  Given this value, companies like Defendants and the Third Parties go to great lengths to intercept such information for use in their targeted advertising campaigns.

7.      Plaintiff brings this action for legal and equitable remedies resulting from these illegal acts.

## **PARTIES**

8.      At all relevant times, Plaintiff was a resident of Philadelphia, Pennsylvania. Plaintiff used Defendants' telehealth platform to schedule several medical appointments between August 28, 2022 and November 22, 2023, while in Pennsylvania.  For example, on or around November 22, 2023, Plaintiff logged into her Cigna patient portal and clicked on a link for telehealth services offered through MD Live.  Plaintiff was then taken to the scheduling portal on the Website, where she searched for treatment options and scheduled her medical appointment.[4] Unbeknownst to Plaintiff, Defendants assisted the Third Parties in tracking her private activity on the Website using the Meta Pixel (the "Facebook Pixel"), Google's DoubleClick, and Google Analytics (collectively, the "Tracking Technologies").  Defendants installed this software on the Website to assist the Third Parties in tracking Plaintiff and intercepting her communications with Defendants, including communications that contained confidential, health-related information concerning her medical appointment.  Neither Defendants, Facebook, nor Google received consent from Plaintiff to track or share her confidential and protected health data to advertisers. Defendants' acts and practices, as described herein, are an egregious breach of Plaintiff's privacy and a breach of their duty of confidentiality as medical providers.

---

[4] In order to protect Plaintiff's privacy, the type of treatment she sought has been omitted from this Complaint.

9.      At all relevant times, Plaintiff has maintained both a Facebook and Gmail account.  When registering for her Facebook account, Meta required that she provide her full legal name, gender, and email address.  When registering for her Gmail account, Google required that she provide her full legal name, date of birth, gender, and contact information.  Every time Plaintiff accesses her Gmail account, Google collects information related to her IP address and electronic device (e.g., browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes.  Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed below.  Google utilizes all of these tracking features to build robust consumer profiles it can then leverage for targeted advertising purposes.

10.     Defendant MDLive, Inc. is a Delaware Corporation, with its principal place of business located at 3350 SW 148th Avenue, Suite 300, Miramar, Florida 33027.

11.     Defendant Evernorth Health, Inc. is a Delaware Corporation, with its principal place of business located at 1 Express Way, St. Louis, Missouri 63121.

12.     Defendants maintain and operate the Website and allow patients to schedule medical appointments for various specialties.  Defendants are subsidiaries of Cigna, and provide telehealth services to Cigna policyholders.  At all times, Defendants knew that the incorporation of the Third Party Tracking Technologies to the Website would result in the interception of confidential personal information.  Defendants are well aware of the dangers of incorporating such technology on the Website, but continue to do so due to the value of the data that is intercepted.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. §1367 because the claim is so related to the federal claim that they form part of the same case or controversy. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000.00 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the Defendants.

14.     This Court has personal jurisdiction over Defendants because Defendants purposefully direct their business activities in this District by offering their services to residents of this District, including by scheduling in-person appointments with doctors in this District.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### I.    THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT ("HIPAA")

16.     Under HIPAA, a healthcare provider may not disclose personally identifiable information ("PII") or protected health information ("PHI") without the patient's express written authorization.[5]

---

[5] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

17.    The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule ("Privacy Rule"), to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosure that may be made of such information without an individual's authorization."[6]

18.    In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), making business associates of HIPAA covered entities directly liable for compliance with certain requirements of the Privacy Rule.[7] Those requirements include the impermissible uses and disclosures of PHI.[8]

19.    A healthcare provider or business associate violates the Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[9]

20.    The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

---

[6] U.S. DEPT. OF HEALTH & HUM. SERVS., THE HIPAA PRIVACY RULE, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[7] American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat 115; *see also* 42 U.S.C. § 17931(b) (applying civil and criminal penalties to business associates for violations of 42 U.S.C. § 1320d-6).

[8] U.S. DEPT. OF HEALTH & HUM. SERVS., DIRECT LIABILITY OF BUSINESS ASSOCIATES, https://hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/factsheet/index.html.

[9] 42 U.S.C. § 1320d-6.

21.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendants when they are knowingly disclosing individually identifiable health information relating to their patients.

22.     Defendants further failed to comply with other HIPAA safeguard regulations as follows:

    (a)     Failing to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

    (b)     Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. Section 164.308(a)(1);

    (c)     Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

    (d)     Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2); and

    (e)     Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3).

23.    Health care organizations and business associates regulated under HIPAA, like Defendants, may use third-party tracking tools, such as the Tracking Technologies, *in a limited way*, to perform analysis on data key to operations.

24.    However, they are not permitted to use these tools in a way that may expose patients' PHI to third-party vendors, as Plaintiff alleges here. As explained by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures**.[10]

25.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule**.[11]

26.    Plaintiff and Class members face the exact risks for which the government expresses concern. Defendants' unlawful conduct resulted in third parties intercepting information regarding Plaintiff's and Class members' medical appointments on Defendants' Website.

---

[10] U.S. DEPT. OF HEALTH & HUM. SERVS., USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added).

[11] *Id.* (emphasis added).

27.     The Bulletin further makes clear how broad the government's view of protected

information is:

> This information might include an individual's medical record number, home or
> email address, or dates of appointments, as well as an individual's IP address or
> geographic location, medical device IDs, **or any unique identifying code**.[12]

28.     The Bulletin goes even further:

> All such [individually identifiable health information ("IIHI")] collected on a
> regulated entity's website or mobile app generally is PHI, even if the individual
> does not have an existing relationship with the regulated entity and even if the IIHI,
> such as IP address or geographic location, does not include specific treatment or
> billing information like dates and types of health care services. This is because,
> when a regulated entity collects the individual's IIHI through its website or mobile
> app, the information connects the individual to the regulated entity (i.e., it is
> indicative that the individual has received or will receive health care services or
> benefits from the covered entity), and thus relates to the individual's past, present,
> or future health or health care or payment for care.[13]

29.     Then in July 2022, the Federal Trade Commission ("FTC") and HHS issued a

joint press release warning regulated entities about the privacy and security risks arising from the

use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human
> Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth
> providers] about the privacy and security risks related to the use of online tracking
> technologies integrated into their websites or mobile apps that may be
> impermissibly disclosing consumers' sensitive personal health data to third parties.

> "When consumers visit a hospital's [regulated entity's] website or seek telehealth
> services, they should not have to worry that their most private and sensitive health
> information may be disclosed to advertisers and other unnamed, hidden third
> parties," said Samuel Levine, Director of the FTC's Bureau of Consumer
> Protection. "The FTC is again serving notice that companies need to exercise
> extreme caution when using online tracking technologies that we will continue
> doing everything in our powers to protect consumers' health information from
> potential misuse and exploitation."

---

[12] *Id.* (emphasis added).

[13] *Id.*

9

"Although online tracking technologies can be used for beneficial purposes, patients and others would not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The tow agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information could reveal sensitive information including health conditions, diagnoses, medications, *medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment*.[14]

30.    Accordingly, Defendants' conduct, as described herein, violates federal law and the clear pronouncements by the FTC and HHS.

## II.    OVERVIEW OF THE THIRD PARTY TRACKING TECHNOLOGIES

### A.    The DoubleClick API

31.    The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[15]

32.    DoubleClick was acquired by Google in 2008.  In 2018, the DoubleClick API was

---

[14] FED. TRADE COMM'N, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Jul. 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-online-tracking (emphasis added).

[15] GOOGLE, DOUBLECLICK DIGITAL MARKETING, https://support.google.com/faqs/answer/2727482?hl=en.

integrated with the Google Analytics API into the Google Marketing Platform.[16]  The Google

Marketing Platform makes use of most of DoubleClick's features, albeit under different brand

names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick

Search is now named Search Ads 360," and DoubleClick Campaign Manager and DoubleClick

Studio are now named Campaign Manager and Studio, respectively."[17]

        33.    As relevant here, however, data is still sent from the Website to Google through

the DoubleClick API, and app developers like Defendants can then use the Google Marketing

Platform to manage the data.  This process is akin to a person setting an old e-mail address to

automatically forward messages to a new e-mail address, rather than manually updating their

contact information on a number of different websites.  Messages would still be sent to the old e-

mail address, but would be routed to the same end recipient, the same way data sent to

DoubleClick still ends up with Google.

        34.    Once integrated into a developer's mobile application, the DoubleClick API

allows an app developer to, among other features, analyze and optimize marketing campaigns

and conduct targeted advertising.[18]

        35.    Once Defendants intercept the Website communications through the DoubleClick

API and disclose such information to Google (in real time), Google has the capability to use such

information for its own purposes.  "Google uses the information shared by sites and apps to

---

[16] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google//products/marketingplatform/360/introducing-google-marketing-platform/.

[17] GOOGLE, INTRODUCING GOOGLE MARKETING PLATFORM, https://support.google.com/displayvideo/answer/9015629?hl=en

[18] GOOGLE, DOUBLECLICK DIGITAL MARKETING, https://support.google.com/faqs/answer/2727482?hl=

deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[19]

36.     For example, Google utilizes the "auid" or "Advertiser User ID" cookies which identify unique users and unique interactions with a website.

37.     Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

38.     Information from websites, like Defendants' Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

39.     In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

40.     Google views and processes every piece of information collected from the DoubleClick API, including the information collected from Defendants' Website, and uses it to assist with data analytics, marketing, and targeted advertising.

41.     Google partners with Defendants in their marketing efforts.  The DoubleClick API is employed on the Website in the manner described throughout this Complaint.

---

[19] GOOGLE, PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

B.    **The Google Analytics Tracking Code**

42.    The Google Analytics tracking code is a piece of code that can be installed onto websites to track page visits, button clicks, text entered into websites, and other actions taken by website visitors, including information such as "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[20]   The tracking code is connected to the Google Analytics platform.

43.    Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

44.    Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

45.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

46.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in

---

[20] GOOGLE, HOW GOOGLE ANALYTICS WORKS,
https://support.google.com/analytics/answer/12159447.

advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

47.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[21]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[22]

48.    Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when Defendants' patients are logged into their private accounts.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

49.    In other words, when interacting with the Website, an HTTP Request is sent to MD Live's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's tracking technologies.

---

[21] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.

[22] *Id.*

50.    Thus, Defendants are essentially handing their patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendants and transmits those communications to third parties like Google.

51.    Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

52.    After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

53.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

54.    The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI.  Google received at least

"Custom Events" and URLs that disclosed the telehealth treatment or services being sought by the patient. Google also received additional PII, including the patients' IP address, device information, and User-IDs.

55.    For example, Google utilizes the "cid" or "Client ID," to help identify users as they navigate Defendants' Website.

56.    In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

57.    These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

58.    As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[23]

59.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[24] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

---

[23] https://www.blog.google/products/chrome/building-a-more-private-web/.

[24] https://www.pixelprivacy.com/resources/browser-fingerprinting/.

60.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[25]

61.     Browser-fingerprints are personal identifiers.  Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

62.     Google's range of SaaS services is based on Google's ability to collect and analyze information about users' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

63.     Due to the vast network of consumer information held by Google, it matches the IP addresses, device information, and User-IDs it intercepts and links such information to an individual's specific identity.

64.     In sum, Google has the capability to use website communications to (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

65.     Information from websites, like Defendants' Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

66.     At all relevant times, the Google Analytics tracking code is employed on the Website in the manner described throughout this Complaint.

---

[25] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

### C.    The Meta Pixel

67.    Meta owns Facebook.  Facebook describes itself as a "real identity platform,"[26] meaning users are allowed only one account and must share "the name they go by in everyday life."[27]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[28]

68.    Meta sells advertising space by highlighting its ability to target users.[29]  Meta can target users so effectively because it surveils user activity both on and off its sites.[30]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[31]  Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[32]

69.    Advertisers can also build "Custom Audiences."[33]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're

[26] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[27] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[28] FACEBOOK, SIGN UP, https://www.facebook.com.

[29] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[30] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=120537668283214.

[31] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[32] https://www.facebook.com/business/news/Core-Audiences.

[33] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=246909795337649.

loyal customers or people who have used [their] app or visited [their] website."[34]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[35]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Meta's "Business Tools."[36]

70.    As Meta puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[37]  Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

71.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[38]  Meta's

---

[34] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[35] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[36] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[37] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[38] See FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; see also FACEBOOK, BEST

Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[39]  Advertisers can even create their own tracking parameters by building a "custom event."[40]

72.    One such Business Tool is the Meta Pixel (the "Meta Pixel").  Meta offers this piece of code to advertisers, like Defendants, to integrate into their websites.  The Meta Pixel "tracks the people and type of actions they take."[41]  When a user accesses a website hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers.  This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendants' Website—Defendants' own code and Facebook's embedded code.

73.    Each time Defendants sent this activity data, they also disclosed a consumer's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can

---

PRACTICES FOR META PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142;
FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.

[39] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[40] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*
FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.

[41] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

look up the user's Facebook profile and name.  Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Meta admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

74.    A user who accessed Defendants' Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

75.    The Meta Pixel is designed to collect information about website visitors that can be matched to an individual's Facebook profile for the purpose of sending targeted advertising to that user.

76.    When the Meta Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the Meta Pixel involves Meta, a separate and distinct third-party entity from the parties in the conversation, using the Meta Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Meta itself is collecting the content of any conversation.  That information is then analyzed by Meta before being provided to any entity that was a party to the conversation (like Defendants).

77.    Once Meta intercepts website communications, it has the capability to use such information for its own purposes.  In 2021, Meta generated over $117 billion in revenue.[42]  With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling

---

[42] FACEBOOK, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

advertising space.[43] Meta sells advertising space by highlighting its ability to target users by including them in the Core Audiences and Custom Audiences offered to its clients.[44]

78.     In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that Meta can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing Meta to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new Meta Business Tools products and services, or improve pre-existing Meta Business Tools products and services.

79.     The Meta Pixel is employed on the Website in the manner described throughout this Complaint.

## III.  DEFENDANTS INSTALLED THIRD PARTY TRACKING TECHNOLOGIES ON ITS WEBSITE AND APP

80.     Defendants maintain the Website, through which they provide telehealth services to their patients.  Because Defendants are subsidiaries of Cigna, many patients access the MD Live the Website their Cigna health insurance portal, as shown in Figure 1.

**Figure 1: Cigna's Portal Linking to MD Live**



---

[43] *Id.* at 63.

[44] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

81.     After clicking the "Talk to a doctor" button, shown above, the patient is taken directly to "Book an Appointment" page of the Defendants' Website.

**Figure 2: MD Live Portal to Select Type of Care**



82.     Unbeknownst to its users, Defendants employed the services of the Third Parties and their tracking technologies on each page of its Website to track its users' activity on the Website and send this information to the Third Parties so the Third Parties could analyze the information and target users with advertising based on those activities.

83.     Defendants intercepted its patients' confidential information from its telehealth Website to monetize that data through targeted advertising.

84.     For example, the Meta Pixel was embedded on the Website, which allowed Defendants to intercept and record "click" events through the Meta Pixel and disclose such information to Meta.  Click events detail information about which page on the Website the user was viewing as well as the selections they were making. Facebook intercepts information including the patient's Facebook ID and the type of appointment scheduled.

85.    Once a user selects the type of appointment, information from this selection is transmitted to MD Live and simultaneously intercepted by the trackers installed on the page.

86.    For example, if a user selected the "Dermatologist" option, Facebook would receive the following information.

### Figure 3: Information Transmitted via Meta Pixel

| | |
|---|---|
| ev | PixelInitialized |
| dl | https://patient.dermatologistoncall.com/mdlive/index.html#/dashboard |
| rl | https://patient.dermatologistoncall.com/mdlive/index.html#/sso/mdlive/token/Owg2aQFAPCOKAZefgwsJPTFOd-O7mDCtl_VZbtdQwzHV5TChdugRebkYYuBEuQ8izVHpocovkpAEpK7r5zTJQOq-hlX-1_yTMtRaKHJIEngSoB6cJRe1cXUk1g-XdGKt |
| if | false |
| ts | 1747916440365 |

87.    The same is true for both DoubleClick and Google Analytics:

### Figure 4: Information Transmitted via DoubleClick



**Figure 5: Information Transmitted via Google Analytics**



88.     From the point that a patient enters the Defendants' Website, nearly every interaction and communication is intercepted by Defendants through the Tracking Technologies and further disclosed by Defendants to the Third Parties.  Such data is then used by Defendants and the Third Parties for targeted advertising purposes.

89.     Defendants' conduct is an egregious breach of its patients' privacy and a violation of state and federal law.

## CLASS ALLEGATIONS

90.     Plaintiff brings this action on behalf of all patients in the United States who accessed the Website and scheduled an appointment through the Defendants' Website in the following Classes (collectively, the "Classes"):

*Nationwide Class.* All natural persons in the United States who, during the Class Period, had their protected personal and medical information disclosed through the Website to

the Third Parties.

*Pennsylvania Subclass.*  All natural persons in the Commonwealth of Pennsylvania who, during the Class Period, had their protected personal and medical information disclosed through the Website to the Third Parties.

91.     Excluded from the Classes are Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which either Defendants have or had a controlling interest.

92.     Plaintiff is a member of the Classes she seeks to represent.

93.     Members of the putative Classes are so numerous that their individual joinder herein is impracticable.  Based on information and Plaintiff's belief, members of the putative Classes number in the hundreds of thousands.  The precise number of putative Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Putative Class members may be notified of the pendency of this action by mail and/or publication through the distribution of Defendants' records.

94.     Common questions of law and fact exist as to all putative Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

(a)     Whether Defendants gave the Class members a reasonable expectation of privacy that their information was not being shared with third parties;

(b)     Whether Defendants' disclosure of information constitutes a violation of the claims asserted;

(c)      Whether Plaintiff and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

(d)      Whether Plaintiff and Class members have sustained damages as a result of Defendants' conduct and if so, what is the appropriate measure of damages or restitution.

95.      Plaintiff's claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct.  Plaintiff has no interests antagonistic to the interests of the other members of the Classes.  Plaintiff and all members of the Classes have sustained economic injury arising out of Defendants' violations of statutory law as alleged herein.

96.      Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the putative Class members she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

97.      The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the putative members of the Classes.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents potential for inconsistent or

contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

98.    Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**COUNT I**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1), *et seq.***
**(On Behalf of the Nationwide Class)**

99.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Nationwide Class against Defendants.

100.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

101.    The ECPA protects both sending and receiving communications.

102.    18 U.S.C. section 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

103.    The transmission of Plaintiff's personally identifying information ("PII") to Defendants' Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. section 2510(12).

104.    The transmission of PII from Plaintiff and Class members to Defendants' Website, with which they chose to exchange communications are "transfer[s] of signs, signals,

writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. section 2510(12).

105.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

106.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

107.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

108.    The following instruments constitute "devices" within the meaning of the ECPA:

    a.    The computer codes and programs Defendants and Third Parties used to track Plaintiff's and Class members' communications while they were navigating the Website;

    b.    Plaintiff's and Class members' browsers;

    c.    Plaintiff's and Class members' mobile devices;

    d.    Defendants and Third Parties' web and ad servers;

    e.    The plan Defendants and Third Parties carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the

Website.

109.    Plaintiff's and Class members' interactions with Defendants' Website are electronic communications under the ECPA.

110.    By utilizing and embedding the tracking technology provided by Third Parties on its Website, Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. section 2511(1)(a).

111.    Specifically, Defendants intercepted—in real time—Plaintiff's and Class members' electronic communications via the tracking technology provided by Meta and Google on the Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to Third Parties.

112.    Defendants intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding PII and PHI, including their identities and medical information related to their telehealth appointments.  This confidential information is then monetized for targeted advertising purposes, among other things.

113.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to affiliates and other Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. section 2511(1)(a), Defendants violated 18 U.S.C. section 2511(1)(c).

114.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the

information was obtained through the interception of an electronic communication in violation of 18 U.S.C. section 2511(1)(a), Defendants violated 18 U.S.C. section 2511(1)(d).

115.    Defendants intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

116.    The party exception in 18 U.S.C. section 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

117.    Defendants used the electronic communications to increase its profit margins. Defendants specifically used the tracking technology provided by Third Parties to track and utilize Plaintiff's and Class members' PII and PHI for financial gain.

118.    Defendants were not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

119.    Plaintiff and Class members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy. Plaintiff and Class members had a reasonable expectation that Defendants would not redirect their communications to Third Parties without their knowledge or consent.

120.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. section 2511(1), *et seq.*

121.    As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiff seeks statutory damages of $10,000, or $100 per day for each violation of 18

U.S.C. section 2510, *et seq.*, under 18 U.S.C. section 2520.

## COUNT II
### Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act
### 18 Pa. Cons. Stat. § 5701, *et seq.*
### (On Behalf of the Pennsylvania Subclass)

122.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Pennsylvania Subclass against Defendants.

123.     The Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

124.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

125.     At all relevant times, Defendants procured the Third Parties to track and intercept Plaintiff's and Pennsylvania Subclass members' internet communications while navigating the Website that Defendants own and operate.

126.    Defendants, when procuring the Third Parties to intercept Plaintiff's communications, intended for the Third Parties to learn the meaning of the content that their patients requested while navigating the telehealth services on the Website.

127.    At all relevant times, the Third Parties intentionally used the intercepted communications for their own purposes, including to improve the Third Parties' own products and services, as well as for targeted advertising.

128.    The wiretapping of Plaintiff and Pennsylvania Subclass members occurred in Pennsylvania, where Plaintiff and Pennsylvania Subclass members accessed the Website and where the Third Parties—as enabled by Defendants—routed Plaintiff's and Pennsylvania Subclass members' electronic communications to their servers.

129.    These communications were intercepted without authorization and consent from Plaintiff and Pennsylvania Subclass members.  Plaintiff and Pennsylvania Subclass members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Pennsylvania Subclass members' electronic communications.  Nor did Plaintiff and Pennsylvania Subclass members provide their prior consent to Defendants' procuring the Third Parties for the foregoing.

130.    Plaintiff and Pennsylvania Subclass members were not aware that their electronic communications were being intercepted by the Third Parties.

131.    Plaintiff and Pennsylvania Subclass members had a justified expectation under the circumstances that their electronic communications would not be intercepted, as such information is protected from disclosure by the HIPAA Privacy Rule.

132.    Plaintiff and Pennsylvania Subclass members have been injured by Defendants' WESCA violations, and pursuant to 18 Pa. Cons. Stat. § 5725(a), seeks statutory damages of

$1,000 for each of Defendants' violations of WESCA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     For a determination that this action is a proper class action;

B.     For an order certifying the Classes, naming Plaintiff as representatives of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

C.     For an order declaring that Defendants' conduct violated the statutes referenced herein;

D.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

E.     For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

F.     For punitive damages, as warranted, in an amount to be determined at trial;

G.     For an order requiring Defendants to disgorge revenues and profits wrongfully obtained;

H.     For prejudgment interest on all amounts awarded;

I.     For injunctive relief as pleaded or as the Court may deem proper;

J.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

K.     For an order granting Plaintiff and Class members such further relief as

the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  May 30, 2025                    Respectfully submitted,

By:    */s/ Mark C. Atlee*

**ATLEE HALL, LLP**
Mark C. Atlee (PA No. 204627)
415 North Duke Street
Lancaster, PA 17602
Tel: (717) 393-9596
Fax: (717) 393-2138
E-mail: mcatlee@atleehall.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck*
701 Brickell Ave., Suite 2100
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: sbeck@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Classes*